Aaron and Yvette **SHANKLE,** Henry L. and Bobbie Rhodes, Rhonda Alcorn, Gary Paul Rhodes, Anthony Gayden, Alvin Phillips Milton Bowers, Beverly Spencer, Sheree Ford, John Drisdale, Zaki Saleh, Rodney Turpin, Ronald Marshall and Thomas Hayes

v.

**TEXAS CITY** and the following persons individually and in their official capacities, Mayor Chuck Doyle, Police Chief Jerry Purdon, and other Unknown Police Officers.

Civ. A. No. G–95–114.

United States District Court,
S.D. Texas,
Galveston Division.

May 4, 1995.

Anthony P. Griffin, Galveston, TX, for plaintiffs.

William Scott Helfand, Hirsch Glover Robinson & Sheiness, Houston, TX, for defendants.

## ORDER

KENT, District Judge.

Pending before the Court is Defendants' Texas City, Mayor Chuck Doyle, individually and in his official capacity, Chief of Police Jerry Purdon, individually and in his official capacity, and unknown police officers' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Plaintiffs' request for declaratory relief is GRANTED. Plaintiff's request for an order enjoining Texas City from establishing unconstitutional roadblocks pursuant to Fed.R.Civ.P. 65 is rendered MOOT, and is thereby DISMISSED WITHOUT PREJUDICE.

### I. Background

Plaintiffs bring this cause of action pursuant to 42 U.S.C. § 1983, alleging that Defendants have deprived, and threatened to deprive, Plaintiffs of their rights to assemble, to be free from unreasonable searches and sei-

zures, to due process and equal protection of the law, and to privileges and immunities of citizens of the United States, contrary to the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Plaintiffs further assert that Defendants' actions have deprived, and threatened to deprive, Plaintiffs of their rights under § 3, § 3a, § 9, § 19, and § 27 of Article I of the Texas Constitution.

Plaintiffs allege that during the summer of 1994, in disregard of the United States Constitution and the Texas Constitution, Texas City's Police Department repeatedly and randomly blockaded all roads leading into the South Acres residential subdivision on selected Sunday afternoons and evenings. The South Acres subdivision is a predominantly African–American neighborhood in Texas City which lies between two parallel streets, FM 1765 (also known as Texas Avenue) and Monticello Drive. Connecting these streets, running perpendicularly, is Vauthier Road. Vauthier Road runs down the middle of South Acres and is therefore the central conduit for travel within South Acres. Access to Vauthier Road is necessary in order to drive into South Acres. This is possible at only three places. Two of these are at FM 1765 and Monticello Drive. The third is located at Carver Avenue. Each of these entrances was allegedly blockaded on a repeated basis during the summer of 1994.

These roadblocks allegedly caused the residents of South Acres, their family members, friends, and business associates grievous harms by denying them entrance to the subdivision, despite the fact that none of the Plaintiffs had done anything wrong. Plaintiffs assert that their daily activities were disrupted, and many were not allowed to return to their own homes.

Plaintiffs assert that the roadblocks were enforced in an arbitrary fashion. By way of example, Plaintiffs allege that during the brief stops at the roadblocks, residents and visitors were not systematically required to provide their drivers licenses or insurance papers. Instead, officers conducting the roadblocks randomly asked for Plaintiffs' drivers licenses. According to Plaintiffs, the residents of South Acres were often denied access to their own homes, even after proving they were residents of South Acres with their drivers licenses and insurance papers. Other Plaintiffs argue that officers simply turned Plaintiffs away without ever giving them an opportunity to show their drivers licenses in order to prove that they were, in fact, residents of South Acres. Plaintiffs also assert that they were never informed as to the duration of the roadblocks or of alternative routes for entering the subdivision.

The purported purpose for the erection of these roadblocks was laudably to combat increased crime resulting from gang activity in the area. Plaintiffs assert that some officers enforcing the roadblocks informed them of the reason for the roadblocks, while other officers summarily denied residents access to their homes. Plaintiffs argue that although the manifest objective of the roadblocks was to reduce criminal activity in the South Acres subdivision, the officers repeatedly stopped and denied access to residents and visitors who were clearly older than the "rowdy youth" originally targeted by the roadblocks.

Plaintiffs assert that the roadblocks reflected a deliberate Texas City policy which was expressly endorsed by the Mayor and the Chief of Police, acting under color of law. Plaintiffs contend that the Defendants had the option of posting police officers to deter or arrest wrongdoers, yet the Defendants chose to employ allegedly unconstitutionally intrusive roadblocks. Moreover, according to the Plaintiffs, the Defendants have promised to continue to operate these allegedly random and arbitrary roadblocks in the future.

Plaintiffs seek declaratory relief on the issue of the constitutionality of Defendants' erection and enforcement of its roadblocks in the South Acres subdivision. Plaintiffs also seek to enjoin the Defendants from erecting or enforcing its roadblocks, at least in the manner alleged here, in the South Acres subdivision in the future. Finally, Plaintiffs bring this action for damages they allegedly sustained as a consequence of Defendants' erection and enforcement of roadblocks in the South Acres Subdivision.

## II. Discussion

A. *The Constitutionality of Defendants' Roadblocks Within the South Acres Subdivision*

The Fourth Amendment was designed not merely to protect against official intrusions whose social utility was less as measured by some "balancing test" than its intrusion on individual privacy; it was designed in addition to grant the individual a zone of privacy whose protections could be breached only where the "reasonable" requirements of the probable-cause standard were met. Moved by whatever momentary evil has aroused their fears, officials—perhaps even supported by a majority of citizens—may be tempted to conduct searches to sacrifice the liberty of each citizen to assuage the perceived evil. But the Fourth Amendment rests on the principle that a true balance between the individual and society depends on the recognition of "the right to be let alone"—the most comprehensive of rights and the right most valued by civilized men.

*Olmstead v. United States* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

The issue before the Court is whether the random erection and enforcement of roadblocks by Defendants at the entrances to a predominantly African–American subdivision violated the Constitutional rights of Plaintiffs who either resided, visited, or conducted business within the subdivision. Defendants created the roadblocks for the ostensible purpose of reducing gang-related criminal activity in the area. While this is certainly a commendable aspiration, Plaintiffs argue that these particular roadblocks constitute seizures and that the seizure of presumably innocent citizens is an affront to a series of rights that an individual possesses by virtue of being a citizen of the State of Texas and the United States. These rights are the right to be let alone, the right of privacy, and the right to travel. Plaintiffs further assert that these roadblocks impinged upon their freedom to assemble.

Defendants argue that the roadblocks in question are analogous to the Border Patrol's stopping of a vehicle at a checkpoint for brief questioning regarding authority to enter the United States. The United States Supreme Court held that in these cases the Constitutional rights of privacy and personal security were not violated. *United States v. Martinez–Fuerte v. United States*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

Defendants further argue that there is no support for Plaintiffs' contention of a Constitutional violation because the Plaintiffs did not allege to have been searched or detained for any extended period of time, nor did Plaintiffs claim to have been subjected to detention at all, given that Plaintiffs might have elected to by-pass the checkpoints in question.

However, this Court finds the roadblocks at issue are inherently different from the Border Patrol checkpoints considered in *Martinez–Fuerte*. The types of roadblocks utilized by the Border Patrol in *Martinez–Fuerte* were routine, fixed, and permanent. The Supreme court in *Martinez–Fuerte* observed:

> Routine [fixed/permanent] checkpoint stops do not intrude similarly [to roving patrol stops] on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest.

*Martinez–Fuerte*, 428 U.S. at 559, 566–567, 96 S.Ct. at 3083, 3086–3087.

The roadblocks imposed in the South Acres subdivision were not fixed or permanent and therefore constituted an undeniable intrusion upon the motoring public. Here, the roadblocks seriously interfered with the

legitimate traffic entering the subdivision.[1] The Court does not challenge the legitimacy of the Plaintiffs' asserted reasons for wishing to enter the South Acres subdivision. The Court sees no sinister motive behind Plaintiffs' wishes to return to their homes after attending church services or working all day. Nor is there anything criminal about a Plaintiff's wish to visit elderly parents, or another Plaintiff's need to pick up a child after work. The Plaintiffs were surprised to encounter the roadblocks when they attempted to enter the subdivision. The Plaintiffs had no way of obtaining knowledge of the roadblocks ahead of time because the roadblocks were, by the Defendants' own admission, unannounced. Unlike the motorist approaching a Border Patrol checkpoint, who knows that he will not be stopped at some later time, the Plaintiffs lacked a similar sense of certainty. Indeed, the roadblocks appeared to be paragons of uncertainty. Some citizens were allowed passage because they were known to police officers. Others were turned away with no explanation whatever. As noted above, many were interrogated or turned away even though clearly beyond any age reasonably associated with "gangs."

The officers operating the roadblocks within the South Acres subdivision had considerably more discretion than that available to officers operating a Border Patrol checkpoint. Indeed, Defendants' roadblocks are more similar to a roving patrol than to a checkpoint established for examining immigration or sobriety. In *United States v. Ramos*, 733 F.Supp. 260 (S.D.Tex.1989), the court held that a roving temporary checkpoint routinely established by a State narcotics officer whenever, wherever, and for whatever length of time he wanted, to check drivers licenses and vehicle documentation, constituted an unconstrained exercise of discretion, and thus was violative of the Fourth Amendment.

The procedure used by officers for making inquiries of motorists wishing to enter the South Acres subdivision was far from standardized. Plaintiffs did not know whether the officers would require them to produce their drivers license or not. Plaintiffs did not know whether the officers would permit them to enter the subdivision or not. Plaintiffs did not know whether alternate routes for entering the subdivision were available. The roadblocks did not serve to reassure the Plaintiffs that the roadblocks were duly authorized as serving an important public purpose. Rather, the roadblocks have caused significant frustration and anxiety. Plaintiffs assert that this sense of uncertainty caused them to alter their way of daily life so as to avoid the risk of not being permitted to return to their homes in the subdivision. If this was activity designed to protect these very citizens from gang activity, it certainly constituted mosquito hunting with an elephant gun.

The Court notes that in *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the United States Supreme Court upheld the constitutionality of a highway sobriety checkpoint program. In making its decision, the Supreme Court analyzed the situation by employing a balancing test derived from its opinion in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). This test involved balancing the State's interest, the effectiveness of sobriety checkpoints in achieving the State's goal, and the level of intrusion upon an individual's privacy caused by the checkpoints.

In *Sitz*, the State had an interest in reducing the number of fatalities resulting from drunk driving. Checkpoints were established in which all vehicles passing through the checkpoints were stopped and their drivers briefly examined for signs of intoxication. Statistics were provided which demonstrated that approximately 1.5% of the drivers passing through the checkpoints were arrested for alcohol impairment. The Supreme Court held that this percentage was sufficiently effective to justify the State's interest in implementing the program; therefore, the program was found to be consistent with the Fourth Amendment.

---

**1.** Ironically, Defendants offer no evidence that the roadblocks were in any way efficacious in actually deterring or interrupting gang activity.

In the present case, the Court must endeavor to balance the Defendants' legitimate interest in law enforcement against the Plaintiffs' individual Constitutional rights. The Defendants certainly have a valid interest in seeking to reduce the number of injuries and deaths resulting from increased gang-related criminal activity. Unfortunately, crime is an increasingly pervasive part of life in America's towns and cities, both large and small. In their efforts to combat crime, police departments across the country have simply been forced to adopt increasingly aggressive means of law enforcement. While this Court in no way wishes to constrain these efforts, this Court would respectfully urge that law enforcement proceed with thoughtful concern. Prior to implementing such intrusive methods of law enforcement, Defendants should attempt to gather some empirical evidence that such methods will, in fact, be effective. Specifically, statistics indicating that crime was measurably reduced after the imposition of roadblocks would be necessary to justify the repeated targeting of a particular neighborhood. Defendants have not offered *any* evidence of the effectiveness of this particular method of combatting crime in this particular targeted area to this Court.

The roadblocks in question were intrusive because they impinged upon the Plaintiffs' Constitutional right to privacy, right to travel, and right to assemble. Courts have long recognized the privacy interest of an individual in a home. *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

The roadblocks in the South Acres Subdivision represented unwarranted governmental intrusion into the privacy of Plaintiffs because the roadblocks denied Plaintiffs access to their own homes without cause. Those Plaintiffs who were residents of the South Acres subdivision had legitimate expectations of privacy in their own homes. In *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), the United States Supreme Court noted that "private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable."

Here, Plaintiffs had a legitimate expectation of privacy in being permitted to return to their own homes unimpeded by governmental intrusions in the form of roadblocks at the entrances to their subdivision, particularly upon proof of identity, residence, and age beyond the targeted range. These roadblocks were not duly authorized by some form of warrant or magisterial approval. Similar to the expectation of privacy in the home, society is prepared to recognize as justifiable the expectation of individuals to be able to return to their homes free from unauthorized governmental intrusion.

Further, the roadblocks prevented Plaintiffs from traveling to their destinations within the subdivision. The roadblocks also prevented Plaintiffs from interacting and assembling with those inside the subdivision. Moreover, it interfered with Plaintiffs' freedom to assemble outside of the subdivision for fear that they would not be permitted to return to their homes. In the absence of clear and convincing evidence of the effectiveness of these roadblocks in diminishing crime, the Court can easily imagine other methods of law enforcement which are less intrusive upon individual rights of Plaintiffs. Simply put, the roadblocks erected in South Acres are not consistent with the Fourth Amendment and are therefore unconstitutional.

On several occasions, usually in Border Patrol situations, the United State Supreme Court has considered the possible availability of an alternative, the "area warrant," that might allow the striking of a slightly different balance between the Government's legitimate needs for law enforcement and the motorist's protected right to travel without interference. *United States v. Jackson* 825 F.2d 853 (5th Cir.1987). In his concurring opinion in *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), Justice Powell compared the illegal alien problem to the situation presented in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), involving housing code violations. In *Camara,* the Supreme Court held that administrative inspections of individual structures could be conducted on the basis of

general knowledge about the area as a whole, rather than specific knowledge concerning the condition of the particular building inspected. However, these "area inspections" had to be accompanied by a warrant unless a traditional exception, such as exigent circumstances, existed. *Camara*, 387 U.S. at 539, 87 S.Ct. at 1736; *Jackson* at 862.

The Court explained that the Fourth Amendment's guidelines for reasonableness required the striking of a careful balance between the need for the search and the limited invasion of privacy occasioned by administrative searches accompanied by a warrant. *Camara*, at 535–37, 87 S.Ct. at 1734–35; *Jackson*, at 862.

Justice Powell and at least four other members of the *Almeida–Sanchez* Court believed that the illegal alien problem in the border region presented an analogous situation to that in *Camara*, and one which might allow limited automobile searches by Border Patrol agents when supported by general knowledge of the area in question and an "area warrant."  ·

In *Camara*, the Supreme Court cited three factors for its conclusion that administrative area inspections of property were reasonable under the Fourth Amendment. These factors included: (1) a long history of judicial and public acceptance; (2) the lack of other means to vindicate the public interest at stake; and (3) the limited invasion of privacy occasioned by administrative inspections, which are neither personal in nature nor aimed at the discovery of evidence of crime. *Id.*; *Almeida–Sanchez*, 413 U.S. at 278, 93 S.Ct. at 2542.

Considering the first factor, this Court finds no evidence that the roadblocks in this instance have a history of judicial and public acceptance. In fact, there is no legal authority directly on point which condones the circumstances present in this case. Case law clearly forbids random, arbitrary checkpoints or roadblocks. Moreover, this Court notes that these types of roadblocks, as used in this situation, are not ever likely to receive judicial or public acceptance if they only occur in predominantly minority neighborhoods.

Applying the second factor, the Court observes that the type of roadblock used in this situation is not the only, and by no means the best, means of enforcing the strong public interest in reducing neighborhood crime and gang activity. This Court is loathe to undertake to micro-manage the day-to-day operations of law enforcement, and does not here attempt to do so. This Court is well aware of the valuable services performed by law enforcement. Officers are daily called upon to place their lives in jeopardy, all in the line of duty. Officers must routinely make split-second decisions that can have life-and-death implications for themselves, as well as those they have sworn to protect. But, even when confronted with such a crisis situation, law enforcement officials must carefully consider all of the surrounding circumstances.

The Court holds that alternative means of curbing gang-related criminal activity exist. For example, police officers may be deployed to patrol roads suspected of being within the "territory" of gang members. Law enforcement personnel are trained to detect suspicious activity and individuals by looking for outwardly visible, articulable facts, and are free to deal with those when confronted. This Court is acutely mindful of the limited financial and human resources available to police departments, and the Court is confident that Defendant Texas City was acting with only the most honorable and benevolent of motives when it erected the roadblocks at issue. However, it must tailor its tactics to precisely address the threat.

Gang-related crime is exacting a terrible toll upon the physical, psychological, and sociological well-being of this country, and by today's ruling, this Court in *no* way wishes to discourage the innovative and aggressive efforts of Texas City's excellent police force to deal with this epidemic problem. Defendant Texas City embraced a new and aggressive method for stopping gang-related crime in the South Acres subdivision. While the erection of roadblocks strategically located at each of the entrances to the South Acres subdivision may have appeared to be the most comprehensive way for dealing with gang-related activity, the chosen method was

overly intrusive upon the individual rights of the residents and visitors to the subdivision.

Certainly, law enforcement officers have broad discretion in fashioning procedures for dealing with crime. Nevertheless, law enforcement is also entrusted with protecting the rights of members of society. Where law enforcement concludes that the specific type of roadblock at issue in this case is the single most effective means of combatting gang-related criminal activity, law enforcement should implement a clear and concise policy that would provide some guidance to the individual officers operating the roadblocks. Standardized protocol that is followed uniformly and applied even-handedly will serve to validate law enforcement's brief intervention into the private lives of individuals, and the public's perception of its benefit.

However, any such policy should be administered with a heavy dose of common sense. Setting up roadblocks to deter young gang members and then denying home access to people clearly beyond any relevant age group is not only arbitrary and capricious, it is insulting and downright silly. In effect, residents and visitors of the South Acres Subdivision were thus not protected from "rowdy youth," but rather they were offended by the callous conduct of ham-handed law enforcement itself.

City officials must strive to tailor methods of law enforcement more narrowly to the specific problem at hand. Obviously, methods that are less intrusive upon the individual rights of society would be favored over those that are more invasive. In selecting a method of law enforcement for dealing with gang-related violence, the Court respectfully suggests that the Defendant City of Texas City conduct public hearings and encourage citizens to provide input with regard to what methods or precautions might be effective. After all, it is the interests of the community which the police department and the City of Texas City wish to respect and safeguard. The Court is in no way compelling Texas City to hold hearings; rather, the Court is only making a good-faith recommendation as to possible ways of addressing the crime problem in a manner that is acceptable to the public.

Turning now to the third factor discussed in *Almeida–Sanchez,* the Court notes that the roadblocks were aimed at detecting criminal activity. In very limited circumstances, "administrative" roadblocks have been held not to violate the Fourth Amendment, but the precise type of roadblock used in the present case is different from the narrow and limited administrative or regulatory inspection because there is no regulatory agency to enforce the anti-gang activity other than the police and the criminal courts. The clear purpose of these laws is not to regulate, but to detect and punish criminal activity. If detentions are allowed without individualized suspicion to deter crime, this could permit preventative detentions in virtually any case. However, the Courts uniformly forbid such practices. There is no administrative scheme that is not part of the penal system in this case, and hence the roadblocks constitute an unconstitutional search and seizure under the Fourth Amendment. *Martinez–Fuerte,* 428 U.S. at 559, 566–67, 96 S.Ct. at 3083, 3086–87.

This Court finds that the gang-related criminal activity in the South Acres subdivision, like the illegal alien problem considered in *Almeida–Sanchez,* is similar to the housing code violations addressed in *Camara.* Roadblocks affecting individual motorists seeking to enter a particular subdivision might be based upon general knowledge about the area as a whole rather than specific knowledge concerning the particular individual. However, this special type of roadblock should be accompanied by a warrant unless a traditional exception to the warrant requirement is present. Thus, where law enforcement has verifiable knowledge of significantly higher rates of crime in a specific area, law enforcement may seek to obtain an "area warrant" prior to erecting roadblocks at key points of entry into the area in question. Then, when coupled with scrutiny of clear indicia of gang participation or activity, and thoughtful processing of persons clearly without the targeted groups, such roadblocks would, in this Court's view, be Constitutionally permissible.

This Court declares Defendants' roadblocks in the South Acres subdivision, in the

precise facts of this case, as violative of the First, Fourth, Fifth, and Fourteenth Amendments, and therefore unconstitutional. Furthermore, Texas Courts have held that while recognizing that the Fourth Amendment analysis is no longer always harmonious with an Article I, Section 9 analysis under the Texas Constitution, Section 9 provides at least as much protection as the Fourth Amendment of the United States Constitution. *State v. Wagner,* 821 S.W.2d 288 (Tex. App.—Dallas 1991, writ ref'd). Therefore, since this Court has concluded that the roadblocks erected within the South Acres subdivision violated the Plaintiffs' Fourth Amendment rights, this Court also finds that the roadblocks violated Plaintiffs' rights under Article I, Section 9 of the Texas Constitution.

With regard to injunctive relief, the Court finds no immediate indication that further identical roadblocks are planned by Defendants, and in light of this ruling, the Court would candidly expect no more. Thus Plaintiff's request for injunctive relief, pursuant to Fed.R.Civ.P. 65, is MOOT. Plaintiffs' claim for injunctive relief is thereby DISMISSED WITHOUT PREJUDICE.

Therefore, by way of summary, the Court today holds that in response to the serious problem of gang-related activity, the Defendant Texas City is strongly encouraged to conduct such hearings or other input mechanisms as it considers appropriate to fashion a clear and identifiable policy with regard to roadblock utilization. Thereafter, the City clearly should formulate and promulgate its policy. With such a policy in place, the City is then free to scrutinize enhanced criminal activity in any particular area, and upon a reasonable showing of its apprehension in this regard, should seek an "area warrant" with the attendant, appropriate magisterial safeguards. The City then would be free to establish such reasonable roadblocks or enhanced surveillance activities as it considers appropriate, to address concerns of gang indicia, gang activity, or enhanced criminal actions associated with gang activity, assuming they are competently and thoughtfully administered. This would clearly pass Constitutional muster and would leave the City free to exercise its inherent discretion to deal with this acute and accelerating problem in a manner reasonably calculated to produce success, while at the same time minimizing unnecessary intrusion into the Constitutional rights of the very citizenry which the City seeks to protect. This is by no means a perfect procedure, and the Court does not today demand absolute adherence to any bright-line formula for related law enforcement activity. However, the Court does seek to assure the City of its abiding concern for effective law enforcement while, at the same time, providing a viable mandate for at least one method of its achievement, in a Constitutionally sound manner.

### B. Entitlement of Individual Defendants to Qualified Immunity

In addition to bringing suit against the Mayor and Chief of Police of Texas City in their official capacities, the Plaintiffs have brought suit against them individually as well. However, supervisory officials may only be held to be liable in any context if there exists evidence of either personal involvement in a Constitutional deprivation or a sufficient causal connection between the supervisor's acts and the wrongful conduct sufficient to permit a court to find a causal link between the conduct of the supervisor and the constitutional violation. *Thompkins v. Belt,* 828 F.2d 298, 303–306 (5th Cir.1987).

Plaintiffs seek to impose vicarious liability upon the Mayor and Chief of Police for what Plaintiffs allege to be unconstitutional misconduct of the police officers operating the roadblocks. The imposition of vicarious liability upon the Mayor and Chief of Police is impermissible, even if the actions of the police officers were violative of Constitutionally protected rights. *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Even if the Plaintiffs stated a cognizable claim which could establish that either or both the Mayor and Chief of police somehow violated a Constitutionally protected right, these Defendants are entitled to qualified immunity.

The United States Supreme Court has developed an objective-reasonableness

test for evaluating the actions of a governmental official claiming qualified immunity. That test requires that the official's action be evaluated against "clearly established law," which consists of statutory or Constitutional rights of which a reasonable individual would have known at the time of the occurrence forming the basis of the Plaintiff's complaint. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This objective-reasonableness test affords qualified immunity protection to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

◼ In determining whether the law is "clearly established," the Court must defer to the Constitutional right that the official has alleged to have violated and consider whether "[t]he contours of the right [were] sufficiently clear that a reasonable [individual] would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Unless no reasonable, similarly situated, Defendant could have considered the conduct of the Defendants to be lawful, under the same prevailing circumstances, qualified immunity applies and dismissal of the individuals in their individual capacities is appropriate. *Id.* at 640–41, 107 S.Ct. at 3039.

◼ Finally, it is the burden of the Plaintiffs to set forth sufficient facts upon which the Court may find that qualified immunity does not apply and does not require dismissal of the individuals. In essence, the burden of overcoming the Defense of qualified immunity rests with the Plaintiffs. *Burns–Toole v. Byrne,* 11 F.3d 1270 (5th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994).

◼ As discussed above, the law was not clearly established as to the Constitutionality of the type of roadblocks erected in the South Acres subdivision, as of the time of their occurrence. Since the Plaintiffs were unable to demonstrate that the law was clearly established with respect to the erection of the type of roadblocks at issue, the

Mayor and Chief of Police are entitled to dismissal of all of the claims against them in their individual and official capacities, and each and all of those claims is hereby DISMISSED WITH PREJUDICE.

◼ With regard to the unknown police officers, this Court finds no indication from the record to demonstrate that these Officers acted in their individual capacity. Plaintiffs claims against the unknown police officers in their individual capacity are DISMISSED WITH PREJUDICE.

◼ Plaintiffs also brought suit against these police officers in their official capacity. Any acts or omissions on the part of the police officers in enforcing the roadblocks were done in the interest of their employer, Defendant City of Texas City. Therefore, any damages resulting from the acts or omissions of the police officers, assuming any finding of liability, would be imputed to the Defendant City of Texas City. Defendants' Motion to Dismiss claims against the unknown police officers in their official capacity is consequently DENIED, *at present.*

C. *Entitlement of Defendant City of Texas City to Sovereign Immunity*

◼ To establish a claim for municipal liability under § 1983, the Plaintiffs must identify in their pleadings: (1) policy (2) of a local governmental entity's final policy maker (3) that caused (4) the Plaintiffs to be subjected to a deprivation of a Constitutional right. *Grandstaff v. City of Borger,* 767 F.2d 161, 169 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). Defendant City of Texas City moves to dismiss the Plaintiff's claims pursuant to Fed. R.Civ.P. 12(b)(6) on the grounds that Plaintiffs have failed to state a claim against the City.

◼ The Court emphasizes that it is not making any determination as to whether Defendant City of Texas City is entitled to sovereign immunity. Nor is the Court prepared to dismiss Defendant City of Texas City from the suit at this point. However, in the event the Court is faced with the issue of sovereign immunity, the Court must examine whether it was the decision of a final policy

maker that caused the alleged deprivation of the Plaintiffs' rights. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). The offending decisions may consist of affirmative acts or omissive acts of acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *Id.* This is a question of fact. Given that these issues still present an open question, Defendant City of Texas City's Motion to Dismiss is DENIED, *for present.*

### III. The Right of Plaintiffs to Recover Damages

■ Plaintiffs brought this action seeking damages for losses allegedly resulting from the erection of roadblocks within the South Acres subdivision by Defendants. The Court hereby grants any Plaintiff who claims *legitimate and compelling* damages, forty-five (45) days from today to replead their causes of action, with genuine specificity. The Court would find compelling: a Plaintiff's inability to obtain emergency medical treatment as a result of the roadblocks; a Plaintiff's inability to protect his or her property from a fire or crime; a Plaintiff's claim that he or she suffered *provable* business losses resulting from broken appointments, or premature closing or the like. The Court is *not* interested in speculative or purely subjective losses suffered by Plaintiffs, nor is this Court interested in considering the complaints of those Plaintiffs who were simply "upset" by the erection of the roadblocks in the subdivision, although they themselves did not suffer any compelling, tangible loss. Such claims do not rise to a level of harm for which this Court can provide relief; therefore, any claims not hereafter substantiated as provided above will be dismissed. This Court has no intention of permitting this case to evolve into a monumental, windfall damages suit against Defendants. This Court has undertaken to provide swift and comprehensive relief. Defendants' conduct was certainly impermissibly intrusive upon the lives of residents and visitors to the South Acres subdivision. The Court has sought to end such practices by the Defendant in the future. Those Plaintiffs who have incurred compelling damages are encouraged to replead their claims. Those Plaintiffs who were simply outraged by Defendants' conduct should endeavor to channel their energy into improving the community so that the underlying reason for roadblocks in South Acres, or anywhere in Texas City, will be just a bad memory rather than a way of life.

### IV. Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART.** Defendant Mayor Chuck Doyle and Defendant Chief of Police Jerry Purdon, in their official and individual capacities, are **DISMISSED WITH PREJUDICE.** Defendants' Motion to Dismiss, as regards claims asserted against unknown police officers, in their *official* capacities, and the City are **DENIED,** *for present.* Any claims asserted against any police officers in their individual capacities are **DISMISSED WITH PREJUDICE.** This Court **DECLARES** the erection of roadblocks in the South Acres subdivision to be **UNCONSTITUTIONAL.** Plaintiffs' request for injunctive relief pursuant to Fed. R.Civ.P. 65 is **MOOT.** Plaintiffs' claim for injunctive relief is consequently **DISMISSED WITHOUT PREJUDICE.**

Plaintiffs who have suffered *compelling* losses as a result of Defendants' erection of the roadblocks in the South Acres subdivision are **ORDERED** to replead their claims within forty-five (45) days of this Order. The parties are otherwise **ORDERED** to file nothing further on any issue addressed herein in this Court, especially Motions to Reconsider or the like, *unless* they can present *compelling* and *relevant* new evidence or legal authority which they could not, through the exercise of due diligence, have presented upon original submission of the pleadings sub justice. *Any and all* further relief on these issues shall be sought in due course from the United States Court of Appeals for the Fifth Circuit, as provided by law. The parties shall each bear their own costs incurred herein to date.

**IT IS SO ORDERED.**